ORIGINAL

FILED IN THE
UNITED STATES DISTRICT COURT
DISTRICT OF HAWAII

DEC 27 2018

at __1__ o'clock and __20__ min. PM
SUE BEITIA, CLERK

Bryan W. Beckmann, *Pro se*
92-980 Kanehoa Loop
Kapolei, HI 96707
(626) 786-5881

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF HAWAII

BRYAN W. BECKMANN,                        )        CIVIL NO. CV18  00503 ACK KSC
                                          )
    Plaintiff,                            )
                                          )
    v.                                    )
                                          )
GORDON I. ITO, Individually and           )        VERIFIED COMPLAINT FOR
as Insurance Commissioner, State of       )        EMPLOYMENT DISCRIMINATION;
Hawaii; KATHLEEN H.                        )        RETALIATION; (EXHIBIT 1, EEOC
NAKASONE, Individually and as             )        CHARGE NO. 486-2018-00415
Chief Deputy Insurance                     )        RIGHT TO SUE LETTER);
Commissioner; COLLEEN L. CHUN,            )        DEMAND FOR JURY TRIAL
Individually and as Chief, Fraud          )
Branch, Insurance Division, State of      )
Hawaii; PAUL S. K. YUEN,                   )
Individually and as Chief, Legal Branch   )
Insurance Division, State of Hawaii;      )
and MARTHA C. IM, Individually and        )
as Staff Attorney, Legal Branch           )
Insurance Division, State of Hawaii,      )
                                          )
    Defendants.                           )
_____        )

    Plaintiff Bryan W. Beckmann hereby complains against Defendants and each of them, and alleges as follows:

### STATEMENT OF CLAIM

    1.    This Complaint stems from a rogue investigation initiated in 2016 by Defendant Colleen Chun a hostile third party and Deputy Hawaii State Attorney General

1

assigned to the Hawaii Insurance Division as its fraud administrator.

2.      In the course of her unilateral investigation into Beckmann's background, Defendant Chun found his inactive private detective business website, "The Beckmann Group," and reported it to Defendant Gordon Ito, the Hawaii Insurance Commissioner.

3.      At all times relevant hereto, Beckmann reasonably believed the website had been removed from the internet by his webmaster in June 2013 only to find out it wasn't because of his mistake, inadvertence or excusable neglect.

4.      Defendants then used this defunct website to falsely claim Beckmann's inactive private investigation business conflicted with his employment as an insurance investigator assigned to the Insurance Division's ("Division") Compliance & Enforcement Branch ("C&E").

5.      Defendant Chun's discovery was motivated by Beckmann's inclusion in a protected class that fueled the overt animus Commissioner Ito had displayed toward him since 2012, when he learned of his hire that provided defendants the perfect opportunity to use the discovery as a pretext to levy six frivolous charges of employment misconduct to censure him.

6.      So, determined were Defendants to drive Beckmann from his job that they made material misrepresentations in their "Charge Letter" dated August 11, 2016 placing him on suspension by changing the actual language of the operative statute they relied upon to punish him entitled "ethical requirements for insurance division staff." *See* HRS §431:2-106[1].

---

[1]   §431:2-106 Ethical requirements for insurance division staff. The commissioner, deputies and employees of the insurance division shall not represent, be employed by, own any securities of, be a creditor of, or be financially interested in any other manner in, any insurer authorized to do business in this State, or in any insurance agency in this State, except that the commissioner, or any deputy or employee, may be a policyholder or obligee of any such insurer. [L 1987, c 347, pt of §2]   Respondents gratuitously added the language "*gave the appearance of a conflict of interest*" to support their goal.

7.     Defendants unsupported interpretation of the statute provided cover to fit their narrative allowing them to pursue a sham investigation against Beckmann and then impose a succession of disciplinary actions against him to include harassment, disparate treatment and retaliation that was a gross abuse of authority for no other purpose than to endanger Beckmann's employment, undermine his job performance and threaten his livelihood because he was a member of a protected class.

8.     Defendants malevolence in turn crippled the C&E Branch until Defendants were forced to drop their frivolous charges, but not before making one last attempt to convince DCCA Director Catherine P. Anakuni Colon ("Director") to at the very least discipline Beckmann with a one day suspension without pay to get their pound of flesh and then use the suspension to their advantage as proof the frivolous charges against him were based in fact and law to cover their tracks amounting to corruption that is the basis for this Complaint.

9.     Beckmann charges five tenured government employees, including four who were licensed Hawaii attorneys and officers of the court who at all times relevant hereto held appointed and/or managerial state positions, with having devised and executed a common scheme and plan, in violation of State and Federal anti-discrimination statutes and other laws to include DCCA internal Policies & Procedures, to directly or constructively terminate the employment of a valuable state employee.

10.     Knowing that their allegations lacked any support in fact or law, Defendants pursued their illegal goal of imposing multiple and severe adverse employment actions against Beckmann without justification from August 11, 2016 to present to include being restricted from meeting with his colleagues in the Fraud Branch and the domain of Defendant Colleen Chun.

11.     The facts and allegations of each paragraph are re-alleged and incorporated into each subsequent paragraph as though fully set forth.

<u>JURISDICTION AND VENUE</u>

12.    This Court has jurisdiction over these Federal and state claims under 42 U.S.C. § 2000e-5(f) and 28 U.S.C. §§ 1331 and 1345.

13.    Venue is proper pursuant to 42 U.S.C. § 2000e-5(f)(3) and 28 U.S.C. § 1391, because the events or omissions addressed in this pleading occurred in Honolulu, Hawaii.

<u>DISCRIMINATORY EMPLOYMENT PRACTICES</u>

14.    By law, the State of Hawaii must maintain a workplace free from discrimination to include harassment, disparate treatment and retaliation.

15.    Defendants abused their authority by planning and executing discriminatory employment practices against Beckmann in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §2000e and the Age Discrimination In Employment Act of 1967, 29 U.S.C. § 621.

16.    On or about August 6, 2018, Beckmann filed a timely "Charge" with the Equal Employment Opportunity Commission ("EEOC") against all Defendants, Charge No. 486-2018-00415.

17.    Beckmann alleged in the Charge he was subjected to workplace discrimination based upon three protected factors – he was Caucasian, white and over 40 years of age resulting in severe and pervasive adverse employment actions being taken against him.

18.    The EEOC attempted unsuccessfully to conciliate the Charge and ultimately issued a Notice of Right to Sue letter that was dated Friday September 28th and received on or about October 1, 2018. *See* **Exhibit 1.**

19.    Beckmann brings this action to enforce the provisions of Title VII of the Civil Rights' Act of 1964, as amended, 42 U.S.C. §2000, *et seq.* ("Title VII") and its State of Hawaii counterpart, chapter 378 of the *Hawaii Revised Statutes*.

Plaintiff alleges that

20.    Each Defendant was the principal and/or agent and/or partner and/or alter ego and/or employee and/or employer and/or co-conspirator of each of the other defendants and

in some manner legally liable for the unlawful discriminatory conduct against him and the damages at issue.

21.     At all times, each Defendant acted within the course and scope of one or more such relationships, and with the express and/or implied knowledge, direction, approval and/or ratification of each of the other Defendants, who were also co-conspirators.

22.     The facts and allegations of each paragraph in this Complaint are re-alleged and incorporated by reference into each subsequent paragraph as though fully set forth.

PARTIES

A.     PLAINTIFF BRYAN W. BECKMANN.

23.     Plaintiff Bryan W. Beckmann resides at 92-980 Kanehoa Loop, Kapolei, HI 96707, in the City and County of Honolulu, Hawaii 96707. His telephone number is (626) 786-5881 and his E-mail address is bbeckmann@thebeckmanngroup.com.

24.     A former resident of Los Angeles County, California, Beckmann moved to Oahu on March 1, 2013 and started a new career as an insurance investigator with the Division's, C&E Branch on March 4, 2013.

25.     A state civil servant, and at all times relevant hereto, Beckmann was a member of a class protected against discrimination in the workplace with respect to the compensation, terms, conditions, and privileges of his employment.

B.     DEFENDANT GORDON I. ITO.

Upon information and belief:

26.     Gordon I. Ito is Japanese and a resident of Honolulu, Hawaii. He has been a government attorney for over two decades and in 2015, was reappointed Insurance Commissioner, a position he holds today at the pleasure of the DCCA Director.

27.     His business address is: State of Hawaii Insurance Division, Department of Commerce & Consumer Affairs, King Kalakaua Building, 335 Merchant Street, 2nd Floor, Honolulu, HI 96813. His state phone number is (808) 586-2799 and his E-mail address is unknown.

28.   At all times relevant hereto, Commissioner Ito knew that state and Federal statutes and internal Departmental and Division policies and procedures protected Beckmann from workplace discrimination.

29.   The highest-ranking appointee in the Division, he was directly responsible for complying with state and Federal Anti-Discrimination statutes and was prohibited from discriminating against Beckmann because of his race, color, or age with respect to the compensation, terms, conditions, and privileges of his employment.

30.   Defendant was directly responsible for ensuring that members of his inner circle to include his subordinates Defendants Colleen Chun, Kathleen Nakasone, Paul Yuen and Martha Im followed the above statutes given Beckmann's status as a member of a protected class

31.   As a government attorney, Commissioner Ito with discriminatory intent, abused his authority by conspiring, assisting, inducing or influencing through the acts of each of the remaining Defendants to directly or constructively terminate Beckmann's state employment that he personally directed, expressly ratified or tacitly endorsed including the acts and omissions set forth herein that establish his claims of discrimination.

C.   DEFENDANT COLLEEN L. CHUN.

Upon information and belief:

32.   Colleen Chun is Chinese, a resident of Honolulu, Hawaii., who at all times relevant hereto, was a member of Defendant Ito's inner circle, and his confidential informant after her discovery of Beckmann's website.

33.   Her business address is: State of Hawaii Insurance Division, Department of Commerce & Consumer Affairs, King Kalakaua Building, 335 Merchant Street, 2nd Floor, Honolulu, HI 96813. Her state phone number is (808) 587-7580 and her E-mail address is unknown.

34.    A government attorney for more than 20 years, she knew that state and Federal statutes and internal Departmental and Division policies and procedures protected Beckmann from workplace discrimination, including harassment, disparate treatment and retaliation.

35.    The highest-ranking appointee in the Division's Fraud Branch, Defendant Chun was directly responsible for complying with state and Federal Anti-Discrimination statutes and was prohibited from discriminating against Beckmann because of his race, color, or age with respect to the compensation, terms, conditions, and privileges of his employment.

36.    As Insurance Fraud Administrator and government attorney and with discriminatory intent, Chun abused her authority by conspiring, assisting, inducing or influencing through the acts of each of the remaining Defendants to directly or constructively terminate Beckmann's state employment that she personally directed, expressly ratified or tacitly endorsed including the acts and omissions set forth herein that establish his claims of discrimination.

D.    <u>DEFENDANT KATHLEEN H. NAKASONE</u>.

Upon information and belief:

37.    Kathleen Nakasone is Japanese and a resident of Honolulu, Hawaii.  She is also <u>related</u> to Defendant Ito and at all times relevant hereto, was his Chief Deputy Commissioner and a member of his inner circle up to the time the Beckmann matter was dropped resulting in a demotion back to her preposition as a Rate and Policy Analyst.

38.    Her business address is: State of Hawaii Insurance Division, Department of Commerce & Consumer Affairs, King Kalakaua Building, 335 Merchant Street, 2nd Floor, Honolulu, HI 96813. Her state phone number is (808) 587-7580 and her E-mail address is unknown.

39.    As the Commissioner's alter ego, Nakasone knew that State and Federal statutes and Departmental and internal Division policies and procedures protected

7

Beckmann from workplace discrimination including harassment, disparate treatment, and retaliation.

40.     The second-highest-ranking appointee in the Division, she was directly responsible for complying with state and Federal anti-discrimination statutes within the course and scope of her supervisory obligations and was prohibited from discriminating against Beckmann because of his race, color or age with respect to the compensation, terms, conditions, and privileges of his employment.

41.     In the Commissioner's absence or at his direction, Nakasone was also responsible for directing and overseeing the daily activities of Insurance Division staff, including aiding and abetting defendants Gordon Ito, Colleen Chun, Paul Yuen and Martha Im who answered directly to her during the Beckmann investigation in concocting a common scheme and plan to terminate his state employment.

42.     As Chief Deputy and with discriminatory intent, Nakasone abused her authority by conspiring, assisting, inducing or influencing through the acts of each of the remaining Defendants to directly or constructively terminate Beckmann's state employment that she personally directed, expressly ratified or tacitly endorsed including the acts and omissions set forth herein that establish his claims of discrimination.

E.     DEFENDANT PAUL S.K. YUEN.

Upon information and belief:

43.     Paul Yuen is Chinese, a resident of Honolulu, Hawaii, a former Deputy Attorney General and Chief Deputy Commissioner who at all times relevant hereto, was a member of Defendant Ito's inner circle. Yuen is Chief of the Legal Branch and supervises Division Attorney Defendant Martha Im.

44.     His business address is: State of Hawaii Insurance Division, Department of Commerce & Consumer Affairs, King Kalakaua Building, 335 Merchant Street, 2nd Floor, Honolulu, HI 96813. His state phone number is (808) 587-6035 and his E-mail address is unknown.

45.    As a former Deputy Attorney General, Chief Deputy Commissioner and Legal Branch Chief for more than 20 years, Defendant Yuen knew that State and Federal statutes and internal Departmental and Division policies and procedures protected Plaintiff from workplace discrimination including harassment, disparate treatment, and retaliation.

46.    The highest-ranking appointee in the Legal Branch, he was directly responsible for complying with state and Federal Anti-Discrimination statutes and was prohibited from discriminating against Plaintiff because of his race, color, or age with respect to the compensation, terms, conditions, and privileges of his employment.

47.    He was also responsible for directing and overseeing the daily activities of his subordinate attorneys, including Martha Im and with discriminatory intent, abused his authority by conspiring, assisting, inducing or influencing through the acts of each of the remaining Defendants to directly or constructively terminate Beckmann's state employment that he personally directed, expressly ratified or tacitly endorsed including the acts and omissions set forth herein that establish his claims of discrimination.

F.    DEFENDANT MARTHA C. IM.

Upon information and belief:

48.    Martha C. Im is Chinese and a resident of Honolulu, Hawaii, and a staff attorney in the Division who at all times relevant hereto, was a member of Defendant Ito's inner circle.

49.    Her business address is: State of Hawaii Insurance Division, Department of Commerce & Consumer Affairs, King Kalakaua Building, 335 Merchant Street, 2nd Floor, Honolulu, HI 96813. His state phone number is (808) 587-3043 and his E-mail address is unknown.

50.    A government attorney, Defendant knew that state and Federal statutes and internal Departmental and Division policies and procedures protected Plaintiff from workplace discrimination, including harassment, disparate treatment, and retaliation.

9

51.    At all times relevant hereto, she was directly responsible for complying with state and Federal Anti-Discrimination statutes and was prohibited from discriminating against Plaintiff because of his race, color, or age with respect to the compensation, terms, conditions, and privileges of his employment.

52.    As a staff attorney and with discriminatory intent, she abused her authority by conspiring, assisting, inducing or influencing through the acts of each of the remaining Defendants to directly or constructively terminate Beckmann's state employment that she personally directed, expressly ratified or tacitly endorsed including the acts and omissions set forth herein that establish his claims of discrimination.

<u>FACTS</u>

1993 - 2009

<u>Nakasone's California and Hawai'i Producer Licenses</u>

53.    Defendant Nakasone was a resident insurance producer in southern California from 1993 to February 4, 2006 when she voluntarily surrendered her California licenses and appointments and moved to Oahu.  She obtained her Hawaii resident producer's license on February 23, 2006 and worked as a financial advisor for AIG Retirement Services until January 2009.

54.    In February 2009, the Division hired her as a rate and policy analyst.  Despite her new job as an insurance regulator, she maintained her resident producer license, her book of insurance business and insurance company appointments, and financial interest in more than twelve (12) Hawaii life insurance companies.

55.    At all times relevant hereto, Nakasone never disclosed to the Division Licensing Branch Chief the fact that she had not surrendered her insurance license and continued to augment her state paycheck with a separate income from the very industry she was regulating, an inarguable conflict of interest expressly prohibited by Hawaii Insurance Code HRS § 431:2-106 that was the same statute she and the other Defendants charged Beckmann with.

56. Defendant Nakasone maintained her Hawaii insurance producer's license until it lapsed on December 19, 2014. After such lapse, a Hawaii licensee has a two-year grace period within to renew her license without repeating the application process and satisfying continuing education requirements.

57. Clearly watching the clock, Nakasone attempted to renew her Hawaii producer's license on December 16, 2016. She personally tried to pay her renewal fee to the Licensing Branch Chief, who had surrendered her own producer's license and a securities license when she accepted employment with the Insurance Division. The Licensing Branch Chief rebuffed her entreaties.

58. Citing the HRS § 431:2-106 prohibition, the Licensing Branch Chief rejected Defendant request. She, of course, should have known the terms of that statute intimately: it was the misstatement of that same statute under which she would later charge Beckmann.

2010

59. Beckmann registered the domain *The Beckmann Group* in 2010.

2011

Beckmann's Investigation Business

60. In January 2011, Beckmann started his own business in Los Angeles as an investigative attorney. He offered Special Investigation Unit ("SIU") services on a contract basis under the trade name "The Beckmann Group," focused on the investigation and prosecution of insurance claims suspected as being fraudulent.

61. At the same time, he began planning to move to Hawaii. He intended to sit for the Hawaii private detective examination and obtain his license before making the move. Beckmann received his license on July 1, 2011.

62. Plaintiff's webmaster designed and constructed the site and he and wrote the text that appeared on his website, *The Beckmann Group*. The purpose of the website was

to market Hawaii insurers, legal community, and the private sector he intended to pursue once he moved to Oahu.  His employment with the Insurance Division intervened.

2012

DCCA Employment Application

63.    On July 12, 2012, Beckmann submitted an employment application to the DHRD Recruiting Office in response to solicitations for Investigator III and IV positions in the Division's C&E Branch ("C&E").  On July 13, 2012, he submitted two cover letters to DHRD, one for the Investigator III position and the other for the Investigator IV position.

64.    On October 2, 2012, Beckmann was notified he had satisfied the requirements for both positions, as well as two others, and was eligible for State employment pending an interview.

65.    In early November 2012, C&E Branch Chief Sam Thomsen and two other Division employees conducted a phone interview with Beckmann and hired him three days later, after the approval of then Chief Deputy Commissioner Defendant Paul Yuen in Commissioner Ito's absence.  Although unknown to Mr. Thomsen at the time he was hired, Beckmann pointed out he was approved for both investigative positions, and of course, wanted the Investigator IV slot.

66.    Shortly thereafter Mr. Thomsen looked into the matter and without suspecting the Commissioner's involvement; Beckmann was told his starting position would be at the Investigator III level thereby derailing him from getting a higher salary because of Defendant Ito's discriminatory animus toward him that became evident shortly thereafter.

67.    In his cover letter, employment application, and during several phone conversations, Beckmann told Mr. Thomsen he held a Hawaii private detective license and had a business website tailored to Hawaii insurers.  As a condition of employment,

Mr. Thomsen asked him to disclose his private detective business to the Hawaii State Ethics Commission ("HSEC") to determine whether his business would be a conflict of interest with his state employment as an insurance investigator.

### First Meeting with Commissioner Ito

68.    Several days after Beckmann was hired, Mr. Thomsen notified him that the Commissioner wanted to meet with him via SKYPE.   Thomsen indicated that the timing of the request was odd, since the Commissioner had never asked for a meeting after an employment offer had been extended.

69.    When the SKYPE meeting occurred, Defendant Ito knew of Beckmann's professional skills, background, and interests.   He used this information to fabricate misinformation about the position Beckmann had accepted.

70.    To dissuade Beckmann from accepting the position, the Commissioner emphasized that his employment with the C&E Branch was an "omnibus position" focused largely on six peripheral responsibilities identified in the C&E Policies and Procedures Manual that didn't involve investigatory skills.   He minimized the investigation of "formal consumer complaints," its core function.   That was a material misrepresentation.

71.    It became immediately obvious that the commissioner was deliberately attempting to make the job appear less attractive, so Beckmann would decide to rescind his acceptance.   Defendant Ito did not tell him the reason(s) he was misrepresenting the job position.

### 2013
### State Employment

72.    Beckmann started work on March 4, 2013.   After meeting Mr. Thomsen, and being welcomed by other Division employees, he learned he was to meet with the Commissioner later that afternoon.

73.     When they met, the first thing the Commissioner said was, "Mr. Thomsen did not have the authority to offer you the job without speaking to me first."

74.     On information and belief, this was the third time since being refused the Investigator IV position three months earlier that Defendant Ito had made it clear that Beckmann was not welcome in the Division.  He reported the incident to Mr. Thomsen immediately after the meeting and since he never heard back, assumed the matter had been taken care of.

### Request for Ethics Opinion

75.     On April 30, 2013 and less than two months from his first day of employment, Beckmann submitted a very detailed memorandum to the HSEC seeking an advisory opinion. The memorandum identified all of the duties and responsibilities of the C&E position, including investigating consumer complaints, as well as the various types of investigations his business proposed to offer the private sector.

### HSEC (draft) Advisory Opinion No. 2013.1.

76.     On May 29, 2013, the HSEC issued draft Advisory Opinion No. 2013. A courtesy copy was sent to Plaintiff for comment before officially posting the Opinion on its website.

77.     HSEC Staff Attorney Nancy Neuffer wrote that, after reading Plaintiff's memorandum and speaking with Mr. Thomsen, "[t]here were only certain aspects of his work as a private investigator that could create a conflict of interest under the State Ethics Code HRS Chapter 84-14."

78.     Further: "The Commission Believes that the State Ethics Code prohibits you from newly acquiring industry companies that do business in Hawaii as clients of The Beckmann Group. For those industry companies that may be active, existing clients of The Beckmann Group, you must recuse yourself from investigating or otherwise being involved as a C&E Branch investigator in matters relating to those

14

companies.[2]"

## Thomsen Memo to Commissioner Ito

79. On June 19, 2013 Mr. Thomsen notified the Commissioner that the Ethics Commission had responded to Plaintiff's request for an advisory opinion.

80. <u>He wrote</u>: "Mr. Beckmann has a private detective license and conducted fraud investigations for insurance companies prior to working for the State of Hawai'i. Ethics rules and §431:2-106 prohibits conflicts of interests (431:2-106 deals specifically with Insurance Division Employees). The attached opinion prohibits the acquiring of new business with insurers in Hawai'i and the recusal from any investigations that may involve existing clients."

81. Mr. Thomsen advised Defendant Ito that the Ethics Commission lacked jurisdiction over HRS §431:2-106 and deferred to him to address the restrictions the statute placed on Plaintiff's outside employment.

## Extension to Respond to (Draft) Advisory Opinion

82. On July 8, 2013, Beckmann asked the HSEC for additional time to submit comments and recommendations regarding Advisory Opinion No. 2013-1.

## Supplemental Motion for Reconsideration to Amend

83. On July 31, 2013 Plaintiff filed the above motion asserting that the HSEC Draft Opinion was overly broad since 40 percent of his business concerned matters other than insurance-related investigations. *But see* Nakasone's 8/11/16 "charge Letter" claiming erroneously: "On July 31, 2013 Plaintiff filed the above motion asserting that he initially challenged the HSEC's opinion but withdrew it after the Commissioner made clear that Insurance Division staff may not solicit insurance companies for business while

---

[2] The Division investigation that was initiated by Ito and Nakasone and conducted by Mr. Thomsen was a sham since Beckmann was never interviewed before being charged with misconduct nor was any investigation done to confirm whether or not Beckmann acquired industry companies doing business in Hawai'i as clients of The Beckmann Group.

employed with the Insurance Division." No such conversation ever took place.

84. Beckmann ultimately withdrew his motion because he had underestimated the time required to run a private investigation firm as a second job.

## Advisory Opinion No. 2013-1

85. After Beckmann withdrew his Motion, the Advisory Opinion was posted on the HSEC website. It had been backdated to May 29, 2013, the date of the draft Opinion.

## Beckmann Meets Respondent Colleen Chun

86. In mid-2013, Defendant Chun accessed a LexisNexis invoice for a nominal amount that showed Beckman had run his own name and that of his deceased father through the Accurint database. She asked Keith Kojima, the supervising fraud investigator, to investigate.

87. Beckmann's explanation, that LexisNexis actively encouraged new users to familiarize themselves with the software by using their own names, satisfied Kojima, who dropped the investigation. Defendant Chun either knew of LexisNexis' policy or, given her supervisory position, should have known of it.

88. This incident was Beckmann's first clue that Defendant Chun was prejudiced against him; she made it clear to the investigators she supervised that they were not to work with Plaintiff on companion cases and he was not welcome in her branch. He reported this fact to Sam Thomsen, his boss, since his C&E colleagues who were not white had easily accessed the database in the course and scope of their investigations without challenge.

89. Starting in April or May 2016, Defendant Chun's animosity and prejudice toward Beckmann became more severe and pervasive, after he conducted a joint investigation with Mr. Kojima without informing her first.

90. [It wasn't until charges were brought against Beckmann some three years later that Defendant Nakasone resurrected the subject of his use of the Accurint database

in her "Charge Letter" as one of six charges against him.  This confirmed Defendant Chun had discovered his website since she was the source of information related to his use of the database.

91.    As a consequence, the Commissioner and Nakasone treated Chun as their confidential informant since neither he nor his Chief Deputy would disclose her identity, and misled Plaintiff to believe someone else had found his website.]

### The Misleading Phrase Proves Respondents' Discriminatory Objectives

92.    Defendant Nakasone's "Charge Letter" included the following statement: "You were provided a copy of the C&E Branch Policies and Procedures Manual and were required to familiarize yourself with them."

93.    Beckmann recognized immediately that Defendants had mischaracterized as part of HRS §431:2-106 the phrase *"avoid any conflicts of interest including the appearance of such."* In fact, the snippet was taken directly from the C&E Branch Policies and Procedures Manual section entitled "Investigating Formal Complaints" that applies only to C&E Branch investigators acting within the course and scope of their duties that states the following: "The investigator is expected to be professional and 'avoid any conflicts of interest including the appearance of such.' The Investigator should operate under the guise of a disinterested fact finder; his or her focus is to investigate allegations of violations of the Insurance Code . . ." [Emphasis added.]

94.    In their effort to manufacture any evidence against Beckmann to warrant discipline, Defendants attempted to mislead him and the Director with a failed attempt to bootstrap that phrase into the conflicts statute, HRS §431:2-106.

95.    In fact, the claim by four Department attorneys that the mere existence of a benign website established *"the appearance of a conflict of interest"* with state employment sufficient to subject Plaintiff to discipline was shamelessly desperate and wrong.

17

96.    Defendants carved out this specific section of the C&E Manual as a pretext to discriminate and discipline Beckmann without providing any proof that it is the applicable standard supporting charges against him.  In fact, Defendants' misuse and misrepresentation of the phrase establishes Beckmann's allegations of discrimination and his damages.

2014

E-mail from Sam Thomsen to Beckmann

97.    On October 21, 2014 Beckmann received the following e-mail from Mr. Thomsen: "Please remove any references to insurance from your website." Defendant Nakasone's "Charge Letter" referred to that request: "Over a full year later in 2014, the C&E Branch Chief became aware of insurance references and insurances services outlined on your websites for the Beckmann Group, your private investigation business. On October 21, 2014, Mr. Thomsen sent an e-mail to you that stated, "Please remove any references to insurance from your website." [Citations omitted.]

98.    Although this was one of six frivolous charges against Beckmann, Defendants' knew or should have known that, given the static nature of the website, it was incapable of receiving referrals from anyone, let alone insurance companies or private clients; thus, removal of any reference to "insurance" was completely unnecessary, Second, Defendants knew that any reference to "insurance" on the site did not violate HRS §431:2-106 since the phrase *"the appearance of a conflict of interest"* was inapplicable. Unlike Defendant Kathleen Nakasone, Plaintiff never represented, was employed by, owned any securities of, or was a creditor or financially interested in any insurer authorized to conduct business in Hawai'i during his State employment.

99.    Neither the HSEC nor Defendants ever told Beckmann to remove the website let alone the word "insurance" until Mr. Thomsen sent his email after the HSEC review. Even then, Mr. Thomsen did not confirm the removal of the word "insurance." Finally, no statutory authority or legal justification required Beckmann to do so, which renders

the request advisory only, and moots any conclusion that Beckmann was insubordinate.

## 2015
### Nakasone's Appointment as Deputy Commissioner and Resident Producer's License

100.   Defendant Paul Yuen was the Chief Deputy Insurance Commissioner in 2015. The Commissioner replaced him with Defendant Nakasone despite her complete lack of training, knowledge, and managerial or investigative experience, and Yuen was returned to his former position, Legal Branch Chief.

101.   As addressed, from the date of her appointment in 2015 through December 19, 2016, Defendant Nakasone allowed her producer's license to lapse. Her attempt to renew her license came to the attention of the Licensing Branch Chief who knew that maintaining work in the industry conflicted with her State employment as Deputy Commissioner and violated HRS §431:2-106. She refused to allow Nakasone to renew her license.

## 2016
### Chun's Discovery of The Beckmann Group Website

102.   After the Accurint incident several months earlier, Defendant Chun's animosity toward Beckmann festered as he continued to collaborate with investigators in the Fraud Branch that she headed, and despite the unfettered animosity she displayed.

103.   In April 2016 Plaintiff was involved in an offsite joint investigation with members of the Fraud Branch. Defendant Chun raged when she learned her investigators were leaving with Beckmann. She was heard yelling at her investigators to more or less stand down, which they ignored as they left their office.

104.   Defendant Chun's unbridled dislike toward Beckmann reached such a peak that her investigators were afraid to invite him into their Branch office or to be seen with him in public. She began to shun Plaintiff's female colleagues who were obviously friendly toward him.

105. Defendant Chun's discriminatory animus erupted in July 2016 when she *sua sponte* initiated a rogue investigation into Plaintiff's background, apparently hoping to find incriminating information to discredit him. Using State resources, she discovered "The Beckmann Group" website in July 2016.

106. Given her public loathing for Beckmann, Defendant Chun used the discovery to maliciously interfere with his employment status. Her eagerness to harm Beckmann blinded her to basic investigative procedure; pitifully, she failed to even confirm whether (a) the website was active, (b) the phone number was in service, (c) the site was being used to solicit insurance business, and, if so (d) the site had generated leads that led to contacts. Only affirmative answers to all of these simple questions might have supported defendants' desire to demonstrate that he, like Defendant Nakasone, might actually have violated HRS §431:2-106.

107. Defendant Chun then decided how and when to present her discovery to the Commissioner.

### Chun's Disclosure of Confidential Information

108. After reporting the website to Defendant Ito, She immediately visited C&E to gloat about the website before official charges were brought against Beckmann.

109. Defendant Chun boasted about her discovery to Mr. Thomsen and Plaintiff's fellow investigator, Nina Couch, disclosing that the Commissioner was opening an internal investigation against him. Crowing "the shit's going to hit the fan," she intended to and did disrupt the operations of the C&E Branch that once again confirmed her discriminatory animus toward Plaintiff.

### Secret Meetings

110. Defendant Chun's discovery of the website gave Commissioner Ito the perfect opportunity to launch a bogus investigation against Beckmann, and he didn't waste any

time setting up meetings with Defendants Nakasone, Chun, Yuen, and Martha Im.[3]

111.   Each of these employees played a role in supporting the Defendant Ito's goal of fabricating a defensible case of employment misconduct against Beckmann. His intent, adopted by his staff, was to actively or constructively terminate his employment, regardless of its illicit foundation or the waste of valuable State resources.

August 11, 2016

Division's Sham Investigation

112.   Between July 2016 and August 11, 2016, the sum total of the Division's investigation was a two-and-a-half-page Preliminary Investigation Report ("the Report") that Mr. Thomsen prepared and submitted to the Commissioner.

113.   Attached to the Report were: (1) Beckman's confidential performance appraisal report; (2) the HSEC Opinion; (3) Thomsen's Memo to File; (4) various screen prints of The Beckmann Group website, (5) the entire C&E Branch Policies and Procedures Manual; (6) the e-mail Beckman sent to the HSEC; (7) Thomsen's e-mail to Plaintiff regarding insurance references, and; (8) two Accurint database searches relating to Plaintiff's and his deceased father.

114.   The Report included three brief paragraphs entitled "Summation of Investigation," "Alleged Facts," and "Recommendations." "Discipline Mr. Beckmann, at the Division level commensurate with his disregarding explicit Division level instructions to refrain from any direct or indirect work for insurance companies and for acting in a manner contrary to the policies of his branch and the instructions of his supervisor and refer the matter of Mr. Beckmann's active solicitation of insurance related business on his website to the HSEC for review and handling."

---

[3] Conspicuously absent from these meetings was Staff Attorney Mary Wilkowski, whose friendship with Beckmann was widely known. Ito suspected and feared that, given her long history as a labor and employment attorney, Wilkowski may have been advising Complainant in this matter and the reason he terminated her employment effective the last day of September.

115.   Page 3 of the Report bore the signature of Mr. Thomsen, dated August 11, 2016. Although Defendants submitted the Report to the HSEC for review, the Commissioner never signed or dated it.  Absent was "COMMISSIONER'S DECISION" and whether the Report had been "Approved or Disapproved" by Defendant Ito.

116.   Given the unsigned Report, the Commissioner could disavow his active involvement in the Beckmann investigation and shield himself from criticism or allegation of wrongdoing.  He could blame others if his plan failed to yield his intended result.

117.   Unlike HSEC attorney Nancy Neuffer, neither Defendant Nakasone nor any other the co-conspirator Defendants ever interviewed Beckmann or his webmaster, both of whom were percipient witnesses.

118.   Defendant Nakasone, like Chun, never confirmed that the website was active or had ever been active. Nakasone never made any effort to contact SIU managers employed by Hawaii insurance companies to determine whether Beckmann was soliciting insurance business directly or indirectly through his website, and instead, fabricated a false narrative his website *"gave the appearance of a conflict of interest"* that was a fraud on the DCCA Director.

119.   Defendant Nakasone also never accepted Beckmann's offer to produce redacted copies of his tax returns to confirm he had never received a 1099 for insurance fraud investigation work.

120.   The inescapable conclusion is that Defendants, and each of them, simply did not want to learn the answers, and risk laying waste to the investigation's ever-so-flimsy foundation and destroying the Commissioner's carefully-laid discriminatory plan to rid his Division of Plaintiff.

Due Process

121.   As experienced government attorneys, Defendants Ito, Chun, Yuen and Martha Im knew that Beckmann's right to due process was a bargained-for benefit

memorialized in the Union contract that they chose to disregard by first failing to prove an actionable infraction.

122.   They also failed to provide adequate notice that Beckmann was the target of an investigation; that his right to verify a reasonable, complete and objective investigation had been triggered, and that irrefutable proof of the infraction(s) supported the charges against him and the discipline proposed.

123.   Defendants adopted the flimsy support for the recommendations in Mr. Thomsen's Report since their decision to ignore Beckmann's rights was premeditated and the charges pretextual.

124.   At the last minute, Beckmann was told he was being suspended for 30 days, "his presence at the work site was detrimental to the proper conduct of the investigation and the operations of the workplace," and he was escorted from the building. In his absence, Defendants moved forward to erase Beckmann's existence in the Division by directly or constructively terminating his employment.

### First Meeting with Nakasone

125.   On August 11, 2016, the same date on which Mr. Thomsen submitted his Report to the Commissioner, Plaintiff was summoned to a conference room.  Completely blindsided, the Deputy Commissioner Defendant Nakasone told him, "You are in serious trouble."  She handed him a three-page "Charge letter" that said he was being placed on immediate "leave with pay, pending investigation of charges."

126.   Without counsel or his union representative, Plaintiff agreed to provide an unrecorded Statement in an effort to expedite resolution of the matter.  Defendant Nakasone read a list of 45 questions prepared by Division Staff Attorney Martha Im that referred to each of the insurance services mentioned on The Beckmann Group website; they were redundant, and Plaintiff stipulated to a statement of those services.

127.   At the end of the meeting, he offered to give Defendant Nakasone the phone number of his webmaster to confirm that the website was never active and to address why it was not removed from the internet in 2013.  Beckmann did not know that Mr. Thomsen had already provided Mr. Alvarenga's cell phone number to Nakasone.

128.   Defendant Nakasone told Plaintiff to pick up his belongings, turn over his Investigator Badge and ID card and had Mr. Thomsen immediately escort him out of the building.

### Nakasone's Call to Beckmann's Webmaster

129.   That evening, Beckmann contacted Mr. Alvarenga at his home, reported that the website was still up, and told him that he had been suspended from work.  During their conversation, Alvarenga received a restricted call on his cell phone at 10:37 p.m. from "Kathleen Nakasone."  She seemed surprised to reach him.

130.   During their brief conversation, Alvarenga tried to explain the purpose of the website and its removal from the internet.  Given the late hour in North Carolina, he offered to make himself available for an interview the next morning, when she abruptly ended the conversation.

131.   The next day, August 12, 2016, Mr. Alvarenga called the Deputy Commissioner's office, identified himself to her secretary, and mentioned his conversation the last night.  Before he could continue, he was told Nakasone was not available to speak to him.

### Restricted Phone Calls

132.   During same time as Defendants were investigating Beckmann, Nakasone made three restricted phone calls from her office to Mr. Alvarenga's cell phone: Sunday 8/7/16 at 10:35a.m., Friday 7/29/16 at 10:28a.m., and Monday, 7/25/2016 at 6:32p.m. (all times EST).

133.   This history confirms that, four days before placing Beckmann on leave, Defendant Nakasone (a) squandered three more opportunities between July 25 and

August 7, 2016, to interview Mr. Alvarenga, and (b) did not want to verify the actual facts and had no intention of allowing him to defend himself. Defendants were committed to their plan to terminate his employment that establishes his claims of discrimination and his damages.

### Second Meeting with Nakasone

134. Defendant Nakasone called a meeting with Beckmann on August 18, 2016, one week after he was suspended. He attended the meeting with his union representative, Rick Hartsell.

135. During the meeting, she told Beckmann she was going to ask the HSEC to initiate a second state investigation of the website. Beckmann asked for the reason she had abruptly ended her call with Mr. Alvarenga and never responded to his overture to answer her questions. Nakasone minimized the significance of Alvarenga's information, despite the record of her four calls within the 16-day period before Beckmann's suspension. Her response? "I just wanted to verify his phone number."

136. That the Deputy Commissioner refused to interview the only unbiased percipient witness in a misconduct matter that threatened a Division employee's employment confirms the pretext/sham of Defendants purported "investigation."

### Nakasone's Letter to HSEC

137. On August 18, 2016, Defendants sent the HSEC a two-page letter written by Defendant Martha Im urging the HSEC to open a second investigation into Beckmann's alleged violations of the 2013-1 Advisory Opinion. Signed by Deputy Commissioner Nakasone, the letter was drafted at the direction of the Commissioner and approved by Defendant Yuen.

138. Defendant Nakasone's letter included 10 attachments: (1) the Report; (2) Plaintiff's 6/6/2013 Employee Performance Appraisal Report; (3) his 9/3/2013 Employee Performance Appraisal Report; (4) HSEC Advisory Opinion No. 2003-1; (5) Mr. Thomsen's Memo to File; (6) a complete copy of The Beckmann Group website pages;

(7) the entire Compliance and Enforcement Branch Policies and Procedures Manuel; (8) the 9/10/2013 e-mail from Beckmann to the Commissioner without response; (9) two Accurint database searches, and; (10) Nakasone's handwritten and typed interview notes[4].

139.   Except for Mr. Thomsen's Report, Defendant Nakasone's interview notes, and copies of Beckmann's June and September 2013 Employee Performance Appraisal reports, these materials were the same one attached to Nakasone's "Charge Letter." The letter read: This letter and attachments are being sent to the Commission for its review and determination to see if the actions of the investigator were in compliance with Advisory Opinion No. 2013-1 and HRS Chapter 84.

140.   Defendants violated Beckmann's right to privacy when they released to HSEC his confidential 2013 Employee Performance Appraisal records that identified his social security number and salary range that had no bearing on the subject investigation.

141.   After completing the requested review, HSEC concluded that no evidence supported Defendants claim that had violated either the "fair treatment" or "confidential information" provisions of the State Ethics Code and closed its investigation. *See* Advisory Opinion 2013-1 at 7.[5]

142.   This unwelcome conclusion required Defendants to adopt a new approach to discipline Plaintiff. It, too, was doomed to fail, despite the investment of more State time and resources.

---

[4] Respondents intentionally omitted the phone number of Beckmann's webmaster from these materials, likely for the same reason the Deputy Commissioner had refused to interview him. His recitation of events would debunk their narrative, chill their efforts to discipline him, and thwart their efforts to terminate his State employment.

[5] The Commission concludes that certain aspects of his work as a private investigator will create conflicts of interest and also appear likely to violate both the fair treatment and confidential information provisions of the State Ethics Code." [Emphasis added.]

### Return from Leave

143.   On September 9, 2016, the Defendant Nakasone notified Beckmann that his leave with pay status was ending and ordered him to report to work, with the following caveat: "Please note that our investigation has not yet concluded. On a temporary basis, you will be assigned alternative duties which do not involve investigating cases until such time that the Hawaii State Ethics Commission makes a preliminary decision."

144.   When he returned, Beckmann learned that Defendants had significantly changed his responsibilities.  Their retaliation included prohibiting him from handling consumer complaints and reassigning his case files to the other three investigators in his Branch.

145.   Defendants single-minded, short-sighted disciplinary actions increased the caseload of the Branch's other investigators, harming office morale, impeding the function of the Branch, and undermining the consumer advocacy purpose of the Division resulting in a 90-day backlog as well as affecting the licensing branch.

146.   The Commissioner also attempted to demote Beckmann from an Investigator IV to Investigator III by urging Mr. Thomsen to rewrite his job description to include only clerical functions: answering consumer calls, and managing an endless stream of agent reviews for the Licensing Branch. [Other things that was ongoing to present without any justification or cause.]

### HSEC Interview and Recorded Statement

147.   Several weeks after Beckmann returned to work, HSEC Attorney Nancy Neuffer contacted Beckmann, who volunteered to provide a recorded Statement. On September 22, 2016 Ms. Neuffer and Daniel Gluck, Executive Director of the Ethics Commission, interviewed Beckmann, in the presence of his union representative.

148.   Mr. Alvarenga also provided a recorded statement, among others whose names were not disclosed.

149.   About two weeks after taking Beckmann's statement, Ms. Nueffer called and told him "unofficially" that she had completed her investigation and no justification supported administrative action by the Commission. She said he could expect the official report to be released after the Commission's October 20, 2016 "Sunshine Law Meeting."

150.   Beckmann told Mr. Thomsen of the call, and he offered to share the news with the Commissioner and obtain his approval to restore him to full duty. The meeting occurred, and the Commissioner refused Mr. Thomsen's request.  He preferred to "wait for the Commission's official report."

HSEC Investigation Closed

151.   On October 20, 2016, Ms. Nueffer sent Beckmann a letter stating "no administrative action would be taken against him by the Commission" and closing the investigation. The 10/20/2016 "Sunshine Law Meeting Minutes of the Hawai'i State Ethics Commission" omitted any reference to the HSEC investigation into Beckmann.

152.   Notwithstanding the promises in Nakasone's 9/9/2016 letter that Beckmann would be returned to full duty after the HSEC issued its decision, Respondents reneged. At the Commissioner's direction and without explanation, he remained on restricted duty that amounted to harassment, desperate treatment and retaliation.

153.   When queried repeatedly about the delay in restoring Beckmann to fully duty, Defendant Nakasone responded from October 20, 2016 to January 2017 that "the investigation into the website is still ongoing" when in fact the Division investigation had already been completed on August 11, 2016.

154.   This statement was false when made, and the Commissioner and Nakasone knew it was false.  Nevertheless, they illegally fostered Defendant's campaign to directly or constructively terminate Beckmann's employment that each co-conspirator Defendant either expressly ratified or tacitly endorsed, including the acts and omissions set forth in this Complaint that establish Beckmann's claims of discrimination and his damages.

<u>Meeting with DCCA Director Catherine P. Anakuni Colon</u>

155.   Since both the Division and the HSEC investigations found no evidence of misconduct and given the fact the Deputy Commissioner represented Beckmann was going to be disciplined, he immediately requested a meeting with his union representative and HR Administrator Patrick Chen to verify the factual basis.

156.   On the following day, Beckmann and Mr. Hartsell had a face to face meeting with the Director advising her of Defendant Nakasone's intentions to impose punishment on him and the fact she was willing to accept a one-day suspension without pay even though she knew all along the Division's investigation was a con job. The Director in turn contacted Beckmann's Branch Chief advising he would not be disciplined.

157.   Plaintiff made an offer of proof the Division failed to make a prima facie case of misconduct.

January 6, 2017

<u>Nakasone's Closing Letter</u>

158.   On or about January 6, 2017, Beckmann received a letter drafted by either Paul Yuen or Martha Im and signed by Nakasone that said: "We have concluded our investigation into the following concerns regarding the Beckmann Group website and as outlined in our letter to you dated August 11, 2016."

159.   The letter addressed only two of the six original charges brought against him to include: "1. Offering and solicitation of insurance services for the Beckmann Group through an active website in clear contradiction of an opinion and instruction issued by the Hawai'i State Ethics Commission, and 2, Offering and solicitation of insurance services for The Beckmann Group through an active website in contradiction of direct verbal and written instructions provided by the Insurance Division, Compliance & Enforcement (C&E) Branch Supervisor and C&E Branch policy."

160.   With respect to the first concern, the Deputy Commissioner admitted the HSEC had concluded that Beckmann had not violated HRS §84-14(b); she accepted the

Commission's finding that Beckmann had not acquired insurance company business while employed with the Insurance Division.

161. With respect to the second Concern, Nakasone's comments constitute a written reprimand: "The Insurance Division maintains the position that it communicated to you on August 11, 2016, the importance of avoiding *"the appearance of conflict"* pursuant to HRS § 431:2-106. This letter shall make clear that the Beckmann Group business website which listed Bryan Beckmann as the principal and which has an active e-mail address may not remain up on the web or other public or private social media, so long as it contains reference to specific services related to insurance, including but not limited to: SIU (special investigation unit) services; EUOs (examinations under oath) related to claims services; and the partnering with insurers and other agencies to prosecute fraud and seek restitution. We have returned you to full-duty on December 21, 2016 and consider this matter closed."

162. Even though Beckmann's website lacked even an active-email address to solicit or an active phone number to receive calls from clients for his investigation business, the Deputy Commissioner's statement confirms she never accepted Beckmann's full exoneration. Although she never stated unequivocally that the "charges" against him were either "unfounded" or "founded," the tone of the letter clearly implied there was a violation.

163. In truth, Nakasone's statement actually affirms the validity of the charge and written reprimand levied against Beckmann, since it restates the exact "charge" she brought against him on August 11, 2016. As such, it confirms her conclusion that her allegations against him were "founded" to justify her previous request to the Director to impose discipline that is the basis for the retaliation and continuing adverse employment actions that followed from January 2017 to present.

164. On information and belief, and in furtherance of a common scheme and plan, the Deputy Commissioner subsequent to the above letter advised Beckmann that there

was no derogatory information in his personnel file regarding the subject matter when in fact she purposely left out her closing letter from his personnel file <u>because it did make a finding</u> of misconduct that she and Commissioner Ito could be used if needed in the future.

January 2017 to Present

<u>Retaliation</u>

165.   The Deputy Commissioner's representation that Complainant was returned to "full duty" in January 2017 was false.   Several days later, the Commissioner barred him from handling insurance consumer and GEICO policy complaints by claiming Tim Dayton ("Dayton"), the general manager of the largest auto insurer in Hawaii, said Beckmann "didn't like ('him')."

166.   Commissioner Ito's used Dayton as a pretext to marginalize Beckmann by removing a significant part of his case load for no other reason than to create dissention between Beckmann and his colleagues in the C&E Branch by further increasing their case load.

167.   Both the Commissioner and his Deputy abused their authority by refusing to provide an explanation, despite Beckmann's numerous requests, why he was being treated differently from the other three investigators in his Branch.

168.   The more Beckmann complained, the more Defendants retaliated. On November 8, 2017, Beckmann's purgatory ended only because one of his colleagues demanded, in writing, that Defendant Ito return Beckmann to full rotation even though he and Mr. Thomsen made numerous written requests over the year that fell on deaf ears.

169.   From 2013 to the present, Defendants have subjected Beckmann, his colleagues and friends in the Division to uneasiness and discomfort in the workplace to avoid their retaliation. For example, fraud branch investigators were afraid to be seen with him to avoid retaliation from Defendant Chun.

170.   Defendant Ito delivered notice to Division staff in June 2018 attorney Mary Wilkowski would be terminated at the end of September, without explanation. Four attorneys typically staff the Legal Branch. With Ms. Witkowski's departure, the Branch would be down two 2 attorneys thus, Ito's indifference to the effects of his personnel decisions have crippled both the Legal and C&E Branches that will ultimately have a significant impact on Hawai'i consumers Ito was bound to protect and serve.

## COUNT ONE

(Discrimination, in Violation of Title VII of the Civil Rights Act
of 1964, 42 U.S.C. § 2000e, et seq.)

171.   The foregoing facts establish that defendants, and each of them, discriminated against Beckmann on the basis of his race (Caucasian), color (white) and age over 40 of age in violation of Title VII by denying him the same terms and conditions of employment available to employees who are not Caucasian, white or 40 years of age, including but not limited to, subjecting him to adverse employment actions thereby denying him the opportunity to work in an employment setting free from disparate working conditions, harassment and retaliation.

172.   Defendants discriminated against Beckmann on the basis of his race, color and age by creating, fostering, accepting, ratifying and/or otherwise failing to prevent or to remedy a hostile work environment that included, among other things, severe and pervasive harassment, disparate working conditions, and retaliation thereby denying him the opportunity to work in an employment setting free from Defendants' adverse employment actions because of his protected status.

173.   Defendants' investigations were unfounded in fact or in law, and each Defendant knew of their invalidity. Nevertheless, each Defendant participated in the sham, and the reasons referenced in their complaints were only a pretext to hide their discriminatory animus.

174.   As a direct and proximate result of Defendants' unlawful and discriminatory conduct in violation of Title VII, Beckmann has suffered and continues to suffer severe

mental anguish and emotional distress, including but not limited to depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering for which he is entitled to an award of monetary damages and injunctive relief.

175.   Defendants' unlawful discriminatory employment practices and conduct in violation of Federal law were outrageous and malicious, were intended to injure Beckmann, and were done with a conscious disregard of his civil rights, entitling him to an award of punitive damages.

## COUNT TWO

(Age Discrimination in Violation of the Age Discrimination
In Employment Act, 29 U.S.C. 621)

176.   The foregoing facts establish that Defendants discriminated against Beckmann on the basis of his age (over 40) in violation of 29 U.S.C. 621 by denying him the same terms and conditions of employment available to employees who are younger, including but not limited to, subjecting him to disparate working conditions and denying him the opportunity to work in an employment setting free from unlawful harassment.

177.   Defendants discriminated against Beckmann on the basis of his age by creating, fostering, accepting, ratifying and/or otherwise failing to prevent or to remedy a hostile work environment that included, among other things, severe and pervasive harassment of Beckmann because of his age.

178.   Defendants never proved the validity of the charges against Beckmann, and the reasons stated in their complaint were only a pretext to hide their discriminatory animus.

179.   As a direct and proximate result of Defendants unlawful and discriminatory conduct in violation of 29 U.S.C. 621, Beckmann has suffered and continues to suffer severe mental anguish and emotional distress, including but not limited to depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence,

and emotional pain and suffering for which he is entitled to an award of monetary damages and other relief.

## COUNT THREE

(Retaliation, in Violation of Title VII of the Civil Rights Act
of 1964, of 1964, 42 U.S.C. § 2000e, et seq.)

180   The foregoing facts establish that Defendants, and each of them, discriminated against Beckmann on the basis of his race (Caucasian), color (white) and age (over 40) in violation of Title VII by denying him the same terms and conditions of employment available to employees who are not Caucasian, white or over 40 years of age, including but not limited to, subjecting him to adverse employment actions thereby denying him the opportunity to work in an employment setting free from disparate working conditions, harassment and retaliation.

181.   Defendants discriminated against Beckmann on the basis of his race, color and age by creating, fostering, accepting, ratifying and/or otherwise failing to prevent or to remedy a hostile work environment that included, among other things, severe and pervasive harassment, disparate working conditions, and retaliation thereby denying him the opportunity to work in an employment setting free from Respondents adverse employment actions because of Beckmann's protected status.

182.   Defendants' investigations were unfounded in fact or in law, and each Respondent knew of their invalidity.  Nevertheless, each Defendant participated in the sham, and the reasons referenced in their complaints were only a pretext to hide their discriminatory animus.

183.   As a direct and proximate result of Defendants' unlawful and discriminatory conduct in violation of Title VII, Beckmann has suffered and continues to suffer severe mental anguish and emotional distress, including but not limited to depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering for which he is entitled to an award of monetary damages and injunctive relief.

184. Defendants' unlawful discriminatory employment practices and conduct in violation of Federal law were outrageous and malicious, were intended to injure Beckmann, and were done with a conscious disregard of his civil rights, entitling him to an award of punitive damages.

## COUNT FOUR

(Retaliation in Violation of the Age Discrimination
in Employment Act, 29 U.S.C. 621)

185. The foregoing facts establish that Defendants discriminated against Beckmann on the basis of his age (over 40) in violation of 29 U.S.C. 621 by denying him the same terms and conditions of employment available to employees who are younger, including but not limited to, subjecting him to disparate working conditions and denying him the opportunity to work in an employment setting free from unlawful harassment.

186. Respondents discriminated against Beckmann on the basis of his age by creating, fostering, accepting, ratifying and/or otherwise failing to prevent or to remedy a hostile work environment that included, among other things, severe and pervasive harassment of Beckmann because of his age.

187. Respondent never proved the validity of the charges against Beckmann, and the reasons stated in their complaint were only a pretext to hide their discriminatory animus.

188. As a direct and proximate result of Defendants' unlawful and discriminatory conduct in violation of 29 U.S.C. 621, Beckmann has suffered and continues to suffer severe mental anguish and emotional distress, including but not limited to depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering for which he is entitled to an award of monetary damages and other relief.

189. Defendants' unlawful discriminatory employment practices and conduct in violation of Federal law was outrageous and malicious, was intended to injure Beckmann, and was done with a conscious disregard of his civil rights, entitling him to

an award of punitive damages.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays that judgment be entered in his favor and against Defendants Gordon I. Ito, Colleen L. Chun, Kathleen H. Nakasone, Paul Yuen and Martha Im and that the Court grant all permissible relief, including, but not limited to, the following:

A.   An award of compensatory damages and punitive damages, and all other appropriate equitable relief, including prejudgment interest, to Mr. Beckmann in an amount to be determined at trial to make him whole for the harm he has suffered and continues to suffer because of the discriminatory conduct alleged in this Complaint;

B.   An award of compensatory and punitive damages to Mr. Beckmann to fully compensate him for the injuries, pain and suffering caused by Defendants Gordon I. Ito, Colleen L. Chun, Kathleen H. Nakasone, Paul Yuen and Martha Im retaliatory conduct, pursuant to and within the statutory limitations of Section 102 of the Civil Rights Act of 1991, 42 U.S.C. § 1981(a).

C.   An award of punitive damages, as justice warrants, and;

D.   Such additional relief as justice may require, together with Plaintiff s attorney's fees, costs and disbursements in this action.

## CERTIFICATION

Under Federal Rule of civil Procedure 11, by signing below, I certify to the best of my knowledge, information, and belief that this complaint: (1) is not being presented for an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; (2) is supported by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law; (3) the factual contentions have evidentiary support or, if specifically identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of rule 11.

I agree to provide the Clerk's Office with any changes to my address where case-related papers may be served. I understand that my failure to keep a current address on file with the clerk's Office may result in the dismissal of my case.

Date of Signing: December 27, 2018

Signature of Plaintiff:

Printed Name of Plaintiff: Bryan W. Beckmann

VERIFICATION

STATE OF HAWAII        )
                             ) ss.
COUNTY OF HONOLULU   )

I, BRYAN W. BECKMANN being first duly sworn on oath, deposes and says:

1.     I am the Plaintiff in the preset matter and a resident of the County of Honolulu, State of Hawaii.

2.     I have read the forgoing Verified Complaint for Employment Discrimination and Retaliation and the documents attached thereto and know the contents thereof.

3.     The same is true of my own personal knowledge, except as to those maters which are therein stated on information and belief, and, as to those matters, I believe them to be true.

Executed on December 27, 2018, at Honolulu County, Hawaii.

Further Affiant Sayeth Naught.

_____
BRYAN W. BECKMANN

Subscribed and sworn to me
this 27TH day of DECEMBER, 2018

NOTARY PUBLIC STATE OF HAWAI'I
JOHN JULIAN   FIRST CIRCUIT
My Commission Expires: 12/08/2021

NOTARY PUBLIC CERTIFICATION
Name: JOHN JULIAN
Doc Description: Discrimination Complaint

No. of Pages: 38, Date of Doc: DEC 27 2018

Notary Signature       DEC 27 2018
                                Date

JOHN JULIAN
NOTARY PUBLIC
No. 13-431
STATE OF HAWAII

JOHN JULIAN
NOTARY PUBLIC
No. 13-431
STATE OF HAWAII